## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANKO SHIPPING, USA<br>Parent Company of Nanko Shipping Guinea<br>1615 L Street, N.W., Suite 340<br>Washington, D.C. 20036<br><br>and<br><br>MORI DIANE,<br>President and Sole Shareholder of<br>Nanko Shipping USA and Nanko Shipping Guinée<br>1615 L Street, N.W., Suite 340<br>Washington, D.C.  20036<br><br>       Plaintiffs,<br><br>   v.<br><br>ALCOA, INC.,<br>201 Isabella St.<br>Pittsburgh, PA 15212<br><br>and<br><br>ALCOA WORLD ALUMINA, LLC,<br>State Highway 35<br>Point Comfort, TX 77978<br><br>SERVE:   CT Corporation System<br>           1015 15th Street, NW<br>           Washington,  D.C.<br><br>       Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES

      COMES NOW Plaintiffs, Nanko Shipping ("Nanko") and Mori Diane, and hereby file

this civil action for damages against Defendants Alcoa, Inc. and Alcoa World Alumina, LLC

(collectively "Alcoa") for a common law breach of contract to a third-party beneficiary and

discrimination on basis of race in violation of Plaintiffs' equal rights under federal law 42 U.S.C. § 1981, et seq.

## NATURE OF THE CASE

This action arises out of Nanko's third-party beneficiary rights, pursuant to an agreement between Nanko Shipping Guinée and the Government of Guinea, in which the Guinean government authorized Nanko to execute the government's shipping rights under Article 9 of its agreement with Defendants to develop and exploit its mineral mining rights. Defendants' refusal to effectuate the government of Guinea's rights via Plaintiffs constitutes a breach of that agreement; such actions on Defendants' part is further influenced and caused by Plaintiffs race. Defendants' actions thus violate Plaintiffs' right to be free from discrimination in contracting under 42 U.S.C. § 1981.

## JURISDICTION AND VENUE

1.  There are two (2) sources of subject matter jurisdiction in this Court: (1) The parties' citizenship is completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs, *see* 28 U.S.C. § 1332; and (2) a substantial part of this action, including Plaintiffs' 42 U.S.C. § 1981, claims arise under the laws of the United States, *see* 28 U.S.C. §§ 1331, 1337.

2.  Additionally, there are two (2) sources of venue in this Court: (1) Plaintiff Nanko Shipping USA, parent company of Plaintiff Nanko Shipping Guinée, is a District of Columbia Corporation; and (2) Defendants operate a business office in and distribute products in the District of Columbia.

## THE PARTIES

3.     Plaintiff, Nanko Shipping USA, owns ninety (90) percent of Nanko Shipping Guinée. Plaintiff Mori Diané, an United States citizen and a Black male, owns ten (10) percent of Nanko Shipping Guinée.    Nanko's principal has provided similar shipping services to more than forty countries throughout the world and has organized the transport of bulk cargoes, equipment, and industrial materials for:

- The U.S. Agency for International Development (USAID);

- The U.S. Department of Agriculture (USDA);

- Several Private Voluntary Organizations;

- Many private and public commercial operators;

- More than forty countries including Guinea, Morocco, Mongolia, Albania, Ethiopia, Georgia, the Philippines, Poland and the Ukraine.

4.     Plaintiffs assert that as third-party beneficiaries of an  agreement between Defendants and the government of Guinea, they are entitled to enjoy control of and/or the benefit of the government's bauxite shipment rights and the returns therefrom, which are valued in excess of $100,000,000.00 per year.

5.     Defendant Alcoa is a corporation organized under the laws of the State of Pennsylvania.

6.     Defendant Alcoa World Alumina is an affiliate of Defendant Alcoa.   Alcoa World Alumina is a corporation organized under the laws of the State of Delaware and was formerly known as Alcoa Alumina & Chemicals, LLC.   Defendants are party to the underlying mining contract and have been directly involved in impeding and restricting Plaintiffs' effectuation of its contract rights.

7.     Upon information and belief, Defendant has had regular, continuous, and ongoing contacts with this jurisdiction, which includes the operation of corporate and government relations offices.

## FACTUAL ALLEGATIONS

8.     Over the past fifty (50) years, one lone mining conglomerate, the "Compagnie des Bauxites de Guinée" ("CBG"), has produced and exported well over 600 million tons of Guinea's bauxite, which is used to produce nearly 150 million tons of aluminum totaling in excess of approximately $400 billion USD. Upon information and belief, Guinea's share of that wealth has been limited to a mere $5 billion USD.

9.     Historically, Guinea has been significantly restricted in its enjoyment of the economic benefits associated with mining exploration, and foreign companies have escaped full compliance with the terms of their contracts to the detriment of Guinean nationals' participation in the stream of commerce related thereto.

### The 'Compagnie des Bauxites de Guinée (CBG)'

10.     The Compagnie des Bauxites de Guinée ("CBG")  Convention (the "Convention") was signed in 1963 to develop one of the world's richest bauxite mines, the aluminum content of which is between 43% and 62%. It is now 49% owned by the Guinean state, and 51% by a consortium composed of Defendant Alcoa, Rio Tinto (an Anglo-Australian firm), and DADCO (a Swiss firm).

### Objectives of the Maritime Transport Rights of Guinea

11.     The CBG Convention contained clear statements about Guinea's ambitions to use its mineral resources to strengthen its economy by creating jobs and increasing participation of Guinea entrepreneurs in the commercial and productive activities derived from bauxite

processing. Further, the Convention clarified the guaranteed returns on respective investment and apportioned a share of the transport rights recognizing the contribution of such transactions to the return the country might earn from the contribution of its minerals to the CBG partnership.

12.  For example, Guinea was, at all times referenced herein, unambiguous about its intention to use shipping rights associated with developed bauxite.  Guinea anticipated as a result of its shipping rights and opportunity to develop a competitive national expertise in shipping as well as the creation of a national fleet of ships to maximize its involvement.  The ambition to build a strong maritime transport capacity is a principle to which all the partners signed on to, and pledged to uphold.  All parties, moreover, understood that long-term transportation contracts are necessary for Guinea to obtain adequate financing for the acquisition of vessels.

13.  To meet these expectations, the signing of the CBG Convention was followed by Guinea's unsuccessful effort to exercise its rights under Article 9 because of resistance from its foreign partner. Two successive shipping companies and joint ventures with the Government of Guinea were unable to secure the 50% shipping rights of the Government of Guinea. Because of these significant obstructions from the foreign partner in implementing Article 9 provisions, the Government of Guinea proceeded with the creation of a third joint venture between the government and Klaveness, a private Swedish shipping company.  That joint venture was controlled significantly by Klaveness in every conceivable respect.  At its inception, Guinomar entered into a seven-year shipping contract with CBG partners. At the expiration of the seven-year contract, the CBG mining companies reduced the contract term to three-years and then to one year, before terminating term contracts with Guinomar.

14.  Having succeeded in eliminating the long-term contract arrangements, which minimally benefitted the Guinean government, the CBG mining companies instituted a system of opaque

tenders that have allowed them to fully control and dominate Guinea's right to control fifty percent of the bauxite transportation rights under the terms and conditions of the CBG.   As a result the following has occurred:

     a.  Tenders are prepared by the partners, without any Guinean participation;

     b.  Offers are evaluated without input from Guinea or any outside party;

     c.  Contract award procedures are neither disclosed nor shared with Guinea;

     d.  A specific clause in the charter parties prohibits ship owners from disclosing any contract information (including the price) to Guinea; and

     e.  The partners refuse to publish any account of revenues derived from the transport of Guinea's portion, and are not willing to surrender or even share these revenues with Guinea;

15.     The immediate contract practices reflect Defendant's disavowance and trivialization of Guinea's rights, as well as an ongoing insensitivity to contributing to the reciprocal development of economic opportunities for Guinean nationals.    It is this flagrant disregard for rights and opportunities derived from Article 9 of the CBG which concretize the claims asserted in this civil action.

Article 9 of the CBG Convention

16.     Consistent with the government's interest in creating a mutually beneficial economic arrangement, the Guinea government and CBG entered into the aforementioned CBG Convention, which included  a provision at Article 9, Labor and Priority given to Guinean Companies.

6

Article 9 reads as follows:

Regarding the jobs which are not requiring skilled labor, the company will exclusively use Guinean labor force. It will be in charge of the recruitment of the labor force, under current labor legislation and will submit its possible recruitment problems to the government that will take the necessary measures to resolve them in agreement with us.

Furthermore, in agreement with the government and with its assistance, it will ensure, under conditions as favorable as possible, the personnel absorption which may be necessary upon the completion of the mining installations prior to their mining.

For all employment requiring specialization, the company will use in priority, subject to equal qualifications and skill, the qualified workers, and the managerial and executive personnel of Guinea.

In order to take into account the will of the government to apply its employment and technical promotion policy, the company, after its creation, will submit a program of progressive africanization of specialists, promoting on one side, the technical training of the qualified Guinean workers, and ensuring on the other hand, the training and employment of the Guinean workers selected by the company among the graduates of the technical or business schools in correspondence with the different departments of the company.

The company will submit it to the government, which will examine them in a more cooperative spirit, the industrialization programs, whose profitability would seem likely.

For each specific project the government and the company will determine, in agreement with the concerned parties, the technical and financial conditions for this project analysis as well as its eventual achievement.

In this context, the company will reserve the priority to supply mineral to the processing industries from their installation in Guinea.

All the work and services the company will have third companies carry out on its behalf in Guinea, which are directly or indirectly related to the execution of this Agreement, should (prices and conditions of performance being equal) be entrusted to companies of Guinean nationality.

These provisions will apply only where they exist, for the time period concerned, companies in Guinea able to perform the work or provide the services in question.

*The government reserves the right, to the extent that it doesn't have a negative impact on the sale of bauxite, to charge for the exported tonnage, to a maximum proportion of 50%, unto vessels flying the Guinean flag or similar or its chartered vessels on the international freight market, everything under the first condition that the freight rates be lower or equal to the current rates on the international freight market under equal conditions for the time period concerned for the freight and the maritime relations in question. (Emphasis added)*

The government and Harvey state here their agreement to examine together the possibility of creating another company, including American and Guinean interests specialized in road, rail and maritime transport.

17.  More explicitly, CBG companies indisputably understood that Article 9 granted to Guinea the right to transport 50% of all bauxite cargos mined by the CBG.

Appointment of NANKO Shipping

18.  On August 12, 2011, the government of Guinea authorized Nanko Shipping to manage and control its shipping rights as per Article 9 of the CBG Agreement pursuant to which Nanko became the ocean transportation provider for the government of Guinea. The government thus expected Nanko Shipping to provide cost-efficient seaborne solutions and logistics for its 50% share in the country's bauxite exports and to effectuate its rights consistent with Article 9 in virtually the same manner in which Guinomar previously executed said shipping rights.

19.  On November 18, 2011, the CBG Board hosted a meeting in New York City. At that time, the government of Guinea announced its authorization and contract award regarding shipment of bauxite to Nanko Shipping pursuant to Article 9 of the Agreement.

20.  On November 18, 2011, the CBG Board acknowledged its intention to exercise the rights granted to it by Article 9, through Resolution No. 8 of the 74th Board of Directors meeting. Pursuant to that Resolution, the Board invited its buyers of bauxite to contact Nanko for the implementation of the CBG Agreement.

8

21.     The government of Guinea further indicated its expectation of the Defendants' full and immediate exercise of its rights, in compliance with the Convention and directives from the Board of Directors and beginning in not later than 2012.

22.     Given Nanko's extensive knowledge and facilitation of arrangements with the precise shipping companies that were historically involved with shipping Guinea's bauxite, the transfer of the subject Guinean shipping rights and shipping contracts to Nanko would have had no negative impact on the cost of transporting bauxite.   Nanko Shipping demonstrated its commitment to offer the same financial and technical conditions as current transport contracts, except that Guinea through Nanko would assume responsibility as the dominant decision maker pertinent to the shipping rights which Guinea rightfully controlled.

23.     Despite a resolution of the CBG  Board of Directors and numerous instructions from the government, CBG members Alcoa, Rio Tinto, and Dadco have steadfastly refused to facilitate a transition of these shipping rights to Nanko, and further refused to take measures in any respect that effectuate the reciprocal empowerment of Guinean nationals.   More specifically, Alcoa has rejected Nanko Shipping in any and all respect as a designated shipping contractor,  except in repeated instances to offer it a micro and limited tender opportunity consistent with its patronizing assessment of  Nanko's rights and capacity to exercise Guinea's rights under Article 9. Plaintiffs submit that Defendants' rights are limited in this regard and no authority exists for its continuous rejection of Guinea's shipping rights via Nanko Shipping.

24.     The background is further instructive. Beginning in or around October through December of 2011, Plaintiffs sought to implement Nanko's shipping rights under its agreement with the government of Guinea.

25.     Following the above referenced CBG Board resolution, passed during its November 18, 2011 New York  meeting, , Diané and Nanko met with representatives of Alcoa in Knoxville, Tennessee to discuss implementation of the board's resolution and its agreement with the Guinean government. These representatives,  responsible for making shipping decisions related to the CBG Bauxite mining transaction in Guinea,   reported to Plaintiffs that Alcoa's management instructed the shipping department to ignore the Board's Resolution.

26.     In those discussions, Alcoa operated on the flawed premise that Alcoa, and not Guinea, continued to control the share of the shipping contract rights, which Guinea has authorized Plaintiffs to execute.    Hence, Alcoa stated to Guinea that Alcoa did not arrange "for its future shipping on a one-time basis but rather, on a rolling basis as market conditions allowed."    Alcoa further stated that "the majority of Alcoa's shipping arrangements for 2012 have previously been finalized in conformance with standard and prudent industry practice."       Based upon this representation, Plaintiffs were led to believe at that time that all of Guinea's shipping rights in 2012 had been conclusively resolved, despite that no reference of this had been mentioned just weeks earlier at the CBG Board meeting in New York.

27.     Defendant Alcoa's Knoxville representatives underscored that Alcoa was not planning any multi-cargo contracts for the balance of 2012.  However, it offered Nanko "the opportunity to bid for Alcoa's spot shipment needs in 2012," and indicated that it would continue to do so as the need arose.

28.     Finally, in a letter to Nanko dated January 5, 2012, Defendant Alcoa added the following:

> Alcoa will be happy to discuss future opportunities for Nanko to provide
> shipping services to Alcoa at any time, but such discussions will necessarily
> have to be based on Nanko being able to provide international standard
> vessels and service, at competitive pricing, on international market terms, all
> to Alcoa's satisfaction. I trust the above information will be helpful in
> allowing you to clearly understand Alcoa's position on these matters.

29.     At no time during Nanko's meeting or per  Defendant's subsequent January 2012 correspondence, did Defendant Alcoa acknowledge  Guinea's  right to control 50% of the shipping rights under its contract with Alcoa via CBG, or Plaintiffs' rights to assume Guinea's shipping rights pursuant to its Agreement with Guinea.  Nor did Defendant Alcoa indicate that further shipping opportunities would be subject to its due diligence.

30.     At all times referenced herein, Plaintiffs were ready, willing, and able to provide shipping services at competitive rates.

Technical Capabilities of NANKO Shipping

31.     Nanko Shipping was keenly sensitive to offering competitive international shipping prices and competitive service, much in the same manner that Guinomar and Klaveness had done up to 2011. Nanko similarly demonstrated to Defendants its abundant qualifications to manage itself and the logistics of bauxite transport from Guinea.  Moreover, to ensure its capability, knowledge and understanding,  and to preclude any barrier to the execution of the Guinea-Nanko Agreement  under Article 9, Nanko  partnered with four (4) of the largest ship owners in the world. More importantly, they included the same companies that transported over the previous years, large shares of Guinea bauxite cargo, including the transport of bauxite for CBG.  These companies are:

- Norden Tankers & Bulker USA Inc. (Denmark);

- Swiss Marine (Switzerland/Singapore);

- Oldendorff Shipping (Germany); and

- Phoenix Bulk Carriers (USA).

32.    In addition to Nanko's experience, these aforementioned shipping partners provided a thorough understanding of international standards and regulations, and pricing, associated with bauxite shipment and port issues, including specific transport experience of CBG bauxite from Kamsar Port in Guinea ("Kamsar").

33.    Nanko's shipping partner, Norden, is one of the oldest shipping companies in the world and is one of the better known in bulk transport. It has several specialized vessels, including approximately fifty-five Panamax and sixty-two Handymax vessels. Further, it had been involved in the CBG bauxite transport business for many years.

34.    Swiss Marine's customers include the largest mining companies, raw materials traders and industrial raw materials purchasers in the world. Its customers also include major mining companies, commodity trading firms and industrial users of bulk raw materials, including: Vale, Rio Tinto, BHP, Glencore, Xstrata, Total, AES Gener, Arcelor Mittal, TKS, Enel, Foskor, International Power, ElectroAndina, GIIC and RWE.

35.    Swiss Marine's fleet is comprised of thirty-five Panamax, fifteen Kamsarmax and eighty Capesize vessels. In 2010, the company transported seventy million tons of cargo including, but not limited to, iron ore, coal, grains, bauxite, fertilizers, and salt. Additionally, the company had a larger number of vessels in the Atlantic Ocean that were well-positioned for loading in the port of Kamsar.

36.     Swiss Marine personnel also enjoy significant experience loading bauxite from Kamsar (dating back to the mid 1980s).  Its key destination points included Aughinish, Stade, Fos, San Cyprian, Port Alfred, and Point Comfort.

37.     Oldendorff, one of the oldest European shipping companies, with a staff of 1,750 people, manages, on average 307 ships.    Its fleet includes eighty-seven Panamax, seventy-five Handysizes and one hundred and six Supramax vessels.  Further, Oldendorf enjoyed more than ten (10) years of experience in the transport of CBG bauxite.

38.     Phoenix Bulk Carriers, founded in 1996, it is a leading ship owner in the dry bulk transportation business.    It is a member of a group called Bulk Partners, a leader in the transportation of bauxite, steel, raw materials and materials derived from the processing of iron ore.    It too enjoyed a long and solid experience in chartering cargo from the CBG port of Kamsar.  Nanko's relationship with these companies ensured competitive pricing and continuity of competitive services, as well as the incorporation of Guinea's best interests in maximizing participation in the shipping process and realizing related opportunities and returns.

39.     Defendants nevertheless ignored Guinea's rights under the CBG as advanced per its agreement with Nanko, and abrogated Nanko's rights to participate in the shipping process in any manner whatsoever.    On the contrary, once Guinea executed the agreement with Nanko, and the Board directed compliance therewith, Defendants were required to make best efforts to transfer the associated shipping rights and responsibilities to Nanko, consistent with Guinea's directive and to allow Nanko to engage in the execution of the agreed upon shipping rights in much the same manner as Defendants allowed Klaveness, an all white Swedish company to do for the period preceding 2011.

40.     Despite Nanko's  ongoing efforts to secure execution of its now third party shipping

rights, Defendants have been steadfast in their non-recognizition of Plaintiffs' rights and refusal

to dutifully facilitate and take all appropriate measures that would allow Nanko to assume

management and control of fifty (50) percent of the shipping rights related to the CBG

convention.   Rather, Defendants have imposed a double standard pertinent to Nanko versus the

standards which they applied to Klaveness per the Guinomar Joint Venture shipping  activities

for more than a twenty (20) year period.

41.     On January 30, 2012 Plaintiffs, once again, reminded Defendant that Guinea's rights,

which Plaintiffs then claimed, were subject to Article 9 of the CNG Convention, were absolute

and not subject to Defendant  Alcoa's discretion; further, Alcoa's failure to respect Guinea's

rights via implemention of its agreement with Guinea constituted a breach of the CBG

Convention.

42.     Plaintiffs, as the government of Guinea's agreed upon shipping agent, consistently

offered to secure appropriate vessels through open tenders in order to effectively deliver ships,

services, and prices "equal to those available in international freight markets, for similar

conditions in the time frame considered for the voyage under similar circumstances," and

possibly to secure freight rates that were 10% to 50% lower than rates which Defendants had

secured for 2012 and thereafter.

43.     Alcoa has, nevertheless, consistently minimized Guinea's shipment rights and imposed

its flawed view that it controls 100% of the bauxite shipping of bauxite rights under Article 9.

To this end, in January-February, 2012 Defendants Alcoa through Rio Tinto Alcan invited

Nanko to offer quotes for the shipment of bauxite cargo, rather than allowing Nanko to itself

manage this shipping issue, which further violates Article 9. In rejecting this offer Nanko, once

again, reminded Rio Tinto that Article 9 of the Convention granted Guinea the right to control fifty-percent of the tenders for the transport of bauxite rather than granted the CBG partners the right to allow Plaintiffs the mere opportunity to bid for a relatively small and insignificant contract which was substantively inapposite to Guinea's and the CBG's intentions.

44.    At all times referenced herein, Plaintiffs have been sensitive to the parameters of the Foreign Corrupt Practices Act and has  disclosed its intentions in all respects to comply therewith.  On March 23, 2012, Plaintiffs met with Defendants in Montreal, Canada, and provided a significant amount of background information which further demonstrated its intention. Upon information and belief, Plaintiffs have been more transparent in this regard than Defendants' previous and ongoing shipping contractors.

45.    Plaintiffs have consistently provided information to Defendants regarding Nanko, its business relationships, its government dealings, and its intended business operation.    Further, Plaintiffs entered into a joint venture agreement with the Guinean government via a quasi-government agency, in a manner similar to the Guinomar joint venture and has transmitted sufficient communication and details regarding the operation and background of this joint venture relationship.  Its partner in the joint venture is an entity called SNG.

46.    Since 2012, Defendants have insisted upon Nanko answering operational questions in a manner of inquiry not imposed during the Guinomar joint venture shipping transaction, and questions not similarly asked of Klaviness.    Nanko sufficiently answered these questions in a manner that satisfied Defendants to offer it micro shipping bid opportunities, but not in manner that would allow Nanko to assume greater control over shipping contract decisions. Defendants' reasons for refusing to honor the agreement between Nanko and Guinea are pretextual in nature and designed to maintain the status quo.

47.    At all times referenced herein, Defendants have acted with impunity, malice and ill will to Plaintiffs actualization of their contract rights, and in a manner in which its highest officials have ratified via their continued and adamant refusal to effectuate Article 9 and its intentions to protect Guinean national interests.

**COUNT I**
**Breach of Third-Party Beneficiary Contract**

48.    Paragraphs 1 through 47 above are hereby incorporated as though each of the factual allegations was restated herein.

49.    Article 9 (entitled "Priority to Guinea Workers and Enterprises"), one of the central clauses of the CBG Convention, notes: "All works and all subcontracting that the company would realize through third parties, on its behalf, in Guinea, and related directly or indirectly to the execution of this Agreement, will (provided that such work or service shall be carried out at equal prices and under equal conditions) be outsourced to Guinean enterprises." More explicitly, the Article grants to Guinea the right to transport 50% of all bauxite cargos mined by the CGB. Said Article created the predicate contractual foundation for a Third Party beneficiary relationship.

50.    Pursuant to Article 9 of the Convention, the Guinean government, via an agreement, authorized Nanko to execute its Article 9 shipping rights.

51.    Defendants Alcoa and their shipping representatives were obligated to recognize Guinea's shipping rights and the delegation of Nanko per agreement to manage and effectuate its shipping rights in good faith.

52.    Despite Plaintiffs' best efforts to ensure compliance with Article 9 and to attain Alcoa's facilitation and transfer of shipping rights to Nanko, Defendants have refused and continue to do so, thereby breaching Article 9 and the subject third party beneficiary relationship and causing

considerable damage to Plaintiffs, in excess of $200,000,000.00. Further, Plaintiffs enjoy prospective and ongoing rights under its Agreement.

53.     At no time since the Guinea-Nanko Agreement have Defendants honored or attempted to honor this agreement or Article 9 of the CBG.

54.     Defendants have insisted upon the view that Guinea's rights are conditional and qualified.

55. The government of Guinea has dutifully exercised its rights under Article 9, selected Plaintiffs to execute its shipping functions and urged Defendants to act consistent therewith. Additionally, Plaintiffs have provided ample information about its operation and intentions. Yet, Defendants refuse to actualize Article 9 and insist upon absolute and dictatorial control over all shipping rights in the CBG direct violation of Article 9.

## COUNT II
### Discrimination on Basis of Race in Violation Equal Rights under the Law, 42 U.S.C. § 1981, *et seq.*

56.     Paragraphs 1 through 55 above are hereby incorporated as though each of the factual allegations was restated.

57.     42 U.S.C § 1981, *et seq.*, prohibits discriminating in contracting on the basis of race in the enjoyment of all benefits, privileges, terms and conditions of said contract.

58.     Plaintiff Nanko Shipping is owned and operated jointly by Plaintiffs Nanko Shipping USA and Diané, a Black American.

59.     Defendants have previously awarded bauxite shipping contracts to the Guinomar joint venture and to Klaveness for bauxite without imposing the same levels of scrutiny and conditions.

60.     Defendants are well aware of Plaintiffs' racial backgrounds and capacities.

61.     Plaintiffs engaged the same shipping companies that Defendants have used for purpose of bauxite shipments under Article 9, except that Nanko would control fifty (50) percent of the bauxite shipping activity and corresponding income.

62.     Indicative of Defendants' motive in not honoring the immediate contract, Defendants in lieu of fifty (50) percent control of shipping rights, communicated to Plaintiffs opportunities in 2012 and 2013 to  ship significantly less  quantities of bauxite than that which is stated  in Article 9.

63.     As a result, Defendants have not taken any measures, whatsoever, transitory, pilot or otherwise, despite the government of Guinea's urgings and CBG's Board resolution, to implement Article 9.    Rather, Defendants have defiantly, intentionally, arbitrarily and subjectively denied Plaintiffs any control whatsoever of Guinea's shipping rights.

64.     Defendants' stated reasons, including its representations regarding its refusal to offer shipping contracts in 2012 to Guinomar, and its other reasons, are mendacious and pretextual.

65.     Defendants' refusal to allow Plaintiffs to enter into and to further benefit from the Guinea-Nanko contract  described above pertinent to Plaintiffs constitute racial discrimination in violation of 42 U.S.C. § 1981, *et seq.*  Defendants knew or should have known that their conduct violated clearly established statutory or constitutional rights against discrimination on account of race.

66.     In view of Plaintiffs' competitive performance, Defendants had no legitimate business reason to deny them equal participation in the bauxite shipping contract and the enjoyment of Article 9 of the CBG Agreement.

67.     Defendants' illegal actions described above directly and proximately caused, and continue to cause Plaintiffs' substantial financial losses.

68.     Defendants engaged in the aforementioned discriminatory actions with malice or with reckless indifference to said Plaintiffs' legal rights.

    **WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment for them and against Defendants and to award damages as follows:

(a)     Compensatory damages in the exact amount to be determined at trial, but in no event less than $250,000,000.00 for up to the three (3) years preceding this action, with interest thereupon;

(b)     Punitive damages, if appropriate, in an exact amount to be determined at trial, but in no event less than $50,000,000.00;

(c)     Declaratory and/or equitable relief which requires Defendants to honor the provision of Article 9 and to effectuate Plaintiffs' shipping rights accorded to it by the government of Guinea immediately and prospectively;

(d)     An appropriate accounting regarding shipping costs during the affected period of all shipping contracts, tax filings, and other financial dealings pertinent to Plaintiff's third-party beneficiary rights;

(e)     Such further relief as this Court deems just and fair including, but not limited to, attorney fees.

**JURY DEMAND**

    Plaintiffs respectfully demand a trial by jury on all issues so triable.

**DATED:** July 30, 2014

Respectfully submitted,

Donald M. Temple [#408749]
1101 15th Street, N.W. Suite 910
Washington, D.C. 20005
(202) 628-1101  Telephone
(202) 628-1149  Facsimile
dtemplelaw@gmail.com
*Attorney for Plaintiff*

20