**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NANKO SHIPPING, USA,**<br>**NANKO SHIPPING GUINÉE, and**<br>**MORI DIANÉ,**<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**ALCOA, INC., and**<br>**ALCOA WORLD ALUMINA, LLC**<br><br>    **Defendants.** | **Case No. 1:14-cv-01301-RMC** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

Come Now Plaintiffs Nanko Shipping Guinée;  Mori Diané, President of Nanko

Shipping USA (also President and CEO, Nanko Shipping Guinée); and Nanko Shipping

USA, by and through undersigned counsel, and respectfully oppose Defendants Alcoa

Inc. and Alcoa World Alumina, LLC's Motion to Dismiss Plaintiffs' Amended

Complaint based upon Federal Rules of Civil Procedure 12(b)(6), 12(b)(1) and 12(b)(7).[1]

For reasons stated more fully below, Plaintiffs urge this court to deny Defendants'

requested relief on all grounds.

I.    **INTRODUCTION**

In 1963, the government of Guinea in West Africa executed the "Compagnie des

Bauxites de Guinée" Convention ("CBG") to develop one of the world's richest bauxite

mines, the aluminum content of which is between forty-three percent (43%)  and sixty-

---

[1] / Nanko Shipping Guinée is an entity formed in and organized under the laws of
Guinée, with an office in the District of Columbia.  See Exhibit  1.

two percent (62%).  It is now forty-nine percent (49%) owned by the Guinean state, and fifty-one percent (51%) owned by a consortium composed of Defendant Alcoa, Rio Tinto (an Anglo-Australian firm), and DADCO (a Swiss firm) (hereafter the "CBG Partners"). This action arises out of Plaintiffs' third-party beneficiary rights, which are derived pursuant to Article 9 of that Agreement and a corresponding Technical Assistance Agreement ("Agreement") between Nanko Shipping Guinée and the government of Guinea.    Against this backdrop, Plaintiffs complaint carefully, and in great detail, outlined Article 9's parameters, and submits here that it intended that third parties, such as Plaintiff Nanko Shipping Guinée would be one of many intended l beneficiaries thereof in order to effectuate Guinea's stated goals.

Since 1963 Defendants, through the CBG,  have produced and exported well over 600 million tons of Guinea's bauxite, which has been used to produce nearly 150 million tons of aluminum, valued in excess of approximately $400 billion USD. Upon information and belief, Guinea's share of that wealth has been limited to a mere $5 billion USD.   Historically, Guinea and its intended beneficiaries have been significantly restricted in the enjoyment of the economic benefits associated with CBG's mining exploration.  Foreign companies, such as Defendants, have escaped full compliance with the terms of their contracts to the detriment of Guinean nationals' participation in the stream of related commerce.

The 1963 CBG Convention allocated the members' respective shipping rights and contained clear statements about Guinea's intentions to use its mineral resources to strengthen its economy by creating jobs, training and increasing Guinean entrepreneur participation in the commercial and productive activities derived from bauxite mining

and processing.   The Convention specified the guaranteed returns on respective investment and apportioned a share of the bauxite transport rights to Guinea, thereby recognizing the contribution of these transactions to the country's return from CBG's exploitation of its minerals.   As illustrated by Article 9 of the CBG, Guinea was unambiguous about its intention to use its share of shipping rights associated with developed bauxite to prioritize its country's development.   *Most significantly, it anticipated development of a competitive national shipping expertise, as well as the gradual creation of a national fleet of ships, to maximize its involvement.  Its interest in developing a strong maritime transport capacity was a principle to which all CBG partners agreed and pledged to uphold*.   All parties further understood that long-term transportation contracts were necessary for Guinea to obtain adequate financing for the acquisition of vessels.

Consistent with the government's interest in creating a mutually beneficial economic arrangement, the parties included Article 9, Labor and Priority given to Guinean Companies, which provides:  as follows:

> Regarding the jobs which are not requiring skilled labor, the company will exclusively use Guinean labor force. It will be in charge of the recruitment of the labor force, under current labor legislation and will submit its possible recruitment problems to the government that will take the necessary measures to resolve them in agreement with us. Furthermore, in agreement with the government and with its assistance, it will ensure, under conditions as favorable as possible, the personnel absorption which may be necessary upon the completion of the mining installations prior to their mining. For all employment requiring specialization, the company will use in priority, subject to equal qualifications and skill, the qualified workers, and the managerial and executive personnel of Guinea. In order to take into account the will of the government to apply its employment and technical promotion policy, the company, after its creation, will submit a program of progressive africanization of specialists, promoting on one side, the technical training of the qualified Guinean workers, and ensuring on the other hand, the training and employment of the Guinean

workers selected by the company among the graduates of the technical or business schools in correspondence with the different departments of the company. The company will submit it to the government, which will examine them in a more cooperative spirit, the industrialization programs, whose profitability would seem likely. For each specific project the government and the company will determine, in agreement with the concerned parties, the technical and financial conditions for this project analysis as well as its eventual achievement. In this context, the company will reserve the priority to supply mineral to the processing industries from their installation in Guinea.  *All the work and services the company will have third companies carry out on its behalf in Guinea, which are directly or indirectly related to the execution of this Agreement, should (prices and conditions of performance being equal) be entrusted to companies of Guinean nationality.* (Emphasis added)

These provisions will apply only where they exist, for the time period concerned, companies in Guinea able to perform the work or provide the services in question.  *The government reserves the right, to the extent that it doesn't have a negative impact on the sale of bauxite, to charge for the exported tonnage, to a maximum proportion of 50%, unto vessels flying the Guinean flag or similar or its chartered vessels on the international freight market, everything under the first condition that the freight rates be lower or equal to the current rates on the international freight market under equal conditions for the time period concerned for the freight and the maritime relations in question.* (Emphasis added). The government and Harvey state here their agreement to examine together the possibility of creating another company, including American and Guinean interests specialized in road, rail and maritime transport.

The CBG companies indisputably understood that Article 9 granted to Guinea the right to transport 50% of all mined bauxite cargo.  To be clear, while not parties to the CBG agreement, the CBG intended that Guinea would employ the services of entities, such as  Nanko Shipping Guinée, to effectuate Article p's prioritization of Guinea's interest.

Plaintiffs present to this court a novel scenario in which the Government of Guinea, pursuant to Article 9 of the CBG, transferred its shipping rights to Nanko Guinée, an intentional third party beneficiary via a separate and distinct legal Technical Assistance Agreement ("TAA") between Guinea and Nanko Shipping Guinée.   The

latter is a rare entity in several respects.  Its principal and Chief Executive Officer, Mori Diané, is a Black American citizen of Guinean heritage who operated two (2) legally distinct Nanko Shipping companies in  the United States and in Guinea.   As plead and as evidenced by Exhibits A, B, and C to the Amended Complaint., Diané also housed Nanko Shipping Guinée along with Nanko Shipping USA in Washington D.C.,    Their major business pursuit was  execution of their  third party beneficiary contract rights derived from  the CBG and rooted  in Nanko Shipping Guinée's TAA with Guinea.  Pursuant to the TAA,  Nanko Shipping USA  worked conjunctively with Nanko Shipping Guinée to effectuate  Guinea's  shipping  rights  and  corresponding  shipping  contracts  and opportunities.  The collaborative nature of the Nanko Shipping companies' relationship is evidenced by their shared business operations,  joint communications with Defendants regarding execution of the TAA, and their shared management.  Diané, on both of their behalfs,   communicated with Defendants, travelled to New York, Knoxville, Montreal, and Paris, met with various CBG executives,  and exchanged a litany of correspondence with Defendants directly from Nanko Shipping Guinée's Washington, D.C. address.  See Exhibits A, B, and C to Amended Complaint.

Defendants  through  their  Knoxville,  Tennessee  Alcoa  Shipping  and  other operations,  significantly  control  the  CBG's  shipping  operation.  They  were  directly involved in decisions which caused commercial harm to Plaintiffs.   See Exhibits A and B to Amended Complaint.    Subsequent to the November, 2011 CBG Board Resolution, Nanko Shipping and Diané were directed to contact and meet with Alcoa representatives at the Knoxville, Tennessee shipping operation.  The Nanko Shipping Plaintiffs did so, at which time Alcoa Steamships' all white representatives refused to recognize Guinea's

rights under the CBG and to take any measures to implement the TAA.   Defendants Alcoa's Knoxville, Tennessee management team, then retained control over  Guinea's shipping rights and continued to awarded shipping contracts to various other white companies, while telling Plaintiffs that their bidding process was closed.      During this same period, Plaintiffs advised Defendants of their agreements with same shipping companies with whom Defendants contracted to perform shipping at equal or lesser pricing. See Amended Complaint at paragraphs 37-56.  Against this backdrop, Plaintiffs' Amended Complaint substantially pleads specific, non-conclusive facts that satisfy the required *prima facie* elements of their respective claims and meet the requisite Igbal-Twomby pleading threshold.  Accordingly, Plaintiffs urge this court to deny Defendants' motion.

## II.  STANDARD OF REVIEW

### A.  Motion to Dismiss

A Rule 12(b)(6) motion is intended to test the legal sufficiency of the complaint; dismissal is inappropriate unless "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Browning v. Clinton,* 292 F.3d 235, 242 (D.C.Cir.2002) (citing *Conley v. Gibson,* 355 U.S. 41, 45-6 (1957)); *Kingman Park Civic Assoc. v. Williams,* 348 F.3d 1033, 1040 (D.C.Cir.2003). The complaint need only set forth a short and plain statement of the claim, thereby giving the defendant fair notice of the claim and the grounds upon which it rests. *Conley,* 355 U.S. at 47. The court must accept as true all allegations of fact set forth in the plaintiff's complaint, construe the complaint in the light most favorable to the plaintiff, and determine whether under any reasonable reading of the pleading, the plaintiff may be entitled to relief. *Browning,* 292

F.3d at 242; *Holy Land Found. for Relief v. Ashcroft,* 333 F.3d 156, 165 (D.C.Cir.2003); *In re United Mine Workers of Am. Employee Ben. Plans Litig.,* 854 F.Supp. 914, 915 (D.D.C.1994). At the Rule 12(b)(6) stage, the court does not assess "the truth of what is asserted or determine[e] whether a plaintiff has any evidence to back up what is the complaint." *ACLU Found. of S. Cal. v. Barr,* 952 F.2d 457, 467 (D.C.Cir.1991).

Generally speaking, there are two types of Rule 12(b)(1) motions. "A facial challenge attacks 'the factual allegations of the complaint' that are contained on 'the face of the complaint,' while a factual challenge is addressed to the underlying facts contained in the complaint." *Al-Owhali,* 279 F.Supp.2d at 13 (quoting *Loughlin v. United States,* 230 F.Supp.2d 26, 35-36 (D.D.C.2002) (citations omitted)). Where a defendant makes a facial challenge, "the [C]ourt must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party," *Erby v. United States,* 424 F.Supp.2d 180, 182 (D.D.C.2006) (citations omitted), just as it would on a motion to dismiss under Rule 12(b)(6), *see Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 93 (D.C.Cir.2002) (noting that the standard for facial challenge to subject-matter jurisdiction "is similar to that of Rule 12(b)(6)"). Where a factual challenge is made, the Court "may consider materials outside the pleadings" to determine whether it has subject-matter jurisdiction over the challenged case or claims, *Jerome Stevens Pharm., Inc. v. FDA,* 402 F.3d 1249, 1253 (D.C.Cir.2005) (citation omitted), and "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence," *Erby,* 424 F.Supp.2d at 182 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (other citations omitted).

This Court may dismiss a complaint on the ground that it fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) if it appears, assuming the alleged facts to be true and drawing all inference in plaintiff's favor, that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *32 Harris v. Ladner,* 127 F.3d 1121, 1123 (D.C.Cir.1997), *cert. denied* 531 U.S. 1147, 121 S.Ct. 1087, 148 L.Ed.2d 962 (2001); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). When evaluating a Rule 12(b)(6) motion, a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [a court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624 (D.C.Cir.1997). However, when matters outside the pleadings are presented to and not excluded by the court, the motion to dismiss shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(d). "The decision to convert a motion to dismiss into a motion for summary judgment is committed to the sound discretion of the trial court." *Flynn v. Tiede–Zoeller, Inc.,* 412 F.Supp.2d 46, 50 (D.D.C.2006) (citing 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 at 159 (3d ed. 2004)). In exercising this discretion, a "reviewing court should not automatically treat a dismissal where external materials were not excluded as a summary judgment, although such treatment may be the most common result.... Rather, the reviewing court must assure itself that summary judgment treatment would be fair to both parties in that the procedural requirements of the applicable rules were observed." *Tele–Commc'ns of Key West, Inc. v. United States,* 757 F.2d 1330, 1334 (D.C.Cir.1985).

Further, this court has recognized that consistent with this Court's prior practice, the Court should convert motions to dismiss which proffer extrinsic exhibits to motions for summary judgment. *See Langley v. Napolitano,* 677 F.Supp.2d 261, 263 (D.D.C.2010) ("[I]t is 'probably the better practice for a district court always to convert to summary judgment so as to avoid ... question[s]' as to whether the attached exhibits were properly consider[ed] in ruling upon a motion to dismiss under Rule 12(b)(6)") (second alteration in the original) (quoting *Marshall Co. Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 n. 6 (D.C.Cir.1993)).

### B.  Summary Judgment

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C.Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505).   Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. 56(c)). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed. R. Civ. 56(e)). All underlying facts and inferences are analyzed in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505.

### III.  ARGUMENT

Plaintiffs'  Amended Complaint establishes sound bases for this court's exercise of jurisdiction and its substantive claims therein.   Plaintiffs attach a document which verifies Nanko Shipping USA's good standing status in the District of Columbia, which moots Defendants' Argument at B.  See Exhibit 1.   Additionally,  Defendants' argument in its Memorandum of Points and Authorities at  C. is  silent  on Plaintiff Nanko Shipping Guinée's status as a real party in interest.   Absent more, Defendants appear to concede that it such.   Plaintiffs respond below to Defendants' remaining arguments.

### A. Absent Plaintiffs' "stipulation of acceptance" thereto, the CBG's Arbitration clause excludes them from its application.

Defendants argue that even if the proper parties are named, the CBG Convention requires that all claims be submitted to arbitration.   Defendants argue that because Plaintiffs allege that this action arises out of their third-party beneficiary rights in connection with Guinea's Article 9 shipping rights, Plaintiffs are bound to the CBG's agreement and its arbitration clause at paragraph 13 therein.   Defendants urge that all of Plaintiffs' claims are subject to the CBG's binding arbitration clause, including Plaintiffs' 1981 claim.   Defendants referenced the segment of the CBG Convention's arbitration

clause which implies that arbitration is required for: "all disputes which in any way are connected with this Agreement and with any legal instruments and legal relationships which might be a consequence thereof."

Defendants' reliance on federal arbitration law is actually fatal to their argument. When determining whether to compel arbitration under the FAA, 9 U.S.C.S. § 1 et seq., a Court must consider first whether the parties had an agreement to arbitrate the dispute To be clear, the FAA does not require parties to arbitrate a dispute unless they have agreed to do so. *Bank of Am., N.A. v. District of Columbia,* 80 A.3d 650, 654 (D.C. 2013). This determination is based on ordinary state-law contract principles. Defendants' argument, however, omits   conveniently omits language in the CBG's Arbitration provision which would require Plaintiffs to have agreed to the provision in order for it to apply.   In this connection, the court's attention is directed to Defendants' Motion's Exhibit 1 at Article 13, which states in pertinent part: "***The above persons or corporate entities, other than the Government, Harvey, and the Corporation, shall stipulate their acceptance of this conciliation and arbitration clause in order to be within its terms***." (Emphasis added) See Defendants' Exhibit 1, page 28, Article 13, CBG Arbitration Clause.  Indeed, the language in this clause is unambiguous.   It is axiomatic that "[a] contract is not ambiguous simply because the parties have disputed interpretations of its terms." *Bagley v. Found. for Preservation of Historic Georgetown,* 647 A.2d 1110, 1113 (D.C.1994). Such ambiguity is present "when, and only when ... the provisions in controversy are[ ] reasonably or fairly susceptible of different constructions or interpretations ... and [a contract] is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of the language in

general, its meaning depends." *Wash. Props., Inc.,* 760 A.2d at 548 (quoting *Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983)).    There are no such ambiguities in the aforementioned language.  The requisite stipulation is non-existent here.  The inclusion of this language in the CBG takes the legs from under Defendants' arbitration argument and nullifies any merit to their argument. Hence, this court's exercise of jurisdiction is neither barred nor impeded by the CBG's arbitration clause

B. **Plaintiffs in asserting a valid third party beneficiary claim need not be parties to the CBG.**

Contrary to Defendants' primary argument, a third-party beneficiary has rights under a contra**ct althou**gh he or she may not be a party to said contract. *See, e.g.,* Restatement (Second) of Contracts § 304, p. 448 (1981) ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty.")  "The status of one unnamed in a contract as a third-party beneficiary is essentially a matter of intention ...." *R.A. Weaver & Assoc. Inc v. Haas & Hayne Corp.,* 663 F.2d 168, 174-75 (D.C. Cir. 1980). "Where the third-party is not named in the contract, the 'intent' of the contract is to be garnered from the facts and circumstances surrounding its formation." *Safer v. Perper,* 56 F.2d 87, 92 (D.C. Cir. 1977) (applying Maryland law).  *See Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd.,* 902 F.Supp.2d 87, 100 (D.D.C.2012) ("Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly the party urged to be a third-party beneficiary." (internal quotation marks and citation omitted)).   Our Supreme Court offered further guidance on this issue in *Domino's Pizza,    Inc. v. McDonald,*    546 U.S. 470,126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006) at fn. 3, which states as follows:  We say "under which the plaintiff has rights"

rather than "to which the plaintiff is a party" because we do not mean to exclude the possibility that a third-party intended beneficiary of a contract may have rights under § 1981. See, *e.g.,* 2 Restatement (Second) of Contracts § 304, p. 448 (1979) ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty").   Hence, this Court should examine the Amended Complaint to ascertain the extent to which Plaintiffs  asserts specific contractual provisions that show that  the contracting parties intended to create third party expectations and rights.   Reference is made to paragraphs 11-14 of the Amended Complaint, which speak in great detail to Guinea's developmental intentions. An excerpt from the CBG referenced is instructive:

> ....
> *All the work and services the company will have third companies carry out on its behalf in Guinea, which are directly or indirectly related to the execution of this Agreement, should (prices and conditions of performance being equal) be entrusted to companies of Guinean nationality.*
>
> *These provisions will apply only where they exist, for the time period concerned, companies in Guinea able to perform the work or provide the services in question. The government reserves the right, to the extent that it doesn't have a negative impact on the sale of bauxite, to charge for the exported tonnage, to a maximum proportion of 50%, unto vessels flying the Guinean flag or similar or its chartered vessels on the international freight market, everything under the first condition that the freight rates be lower or equal to the current rates on the international freight market under equal conditions for the time period concerned for the freight and the maritime relations in question. (Emphasis added).*
> See Amended Complaint at para. 13.

This particular language, with all attending inferences in Plaintiffs' favor, underscores the CBG's clear intention that Guinea would necessarily engage third parties to execute the agreed upon Article 9 objectives.

The Court also recognized that any claim brought under § 1981, must initially identify an impaired "contractual relationship under which plaintiffs have rights. *As well,*

*such a contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those who already have made contracts."* Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). (Emphasis added)    In *Runyon*, the court subjected defendants to liability under § 1981 when, for racially motivated reasons, they prevented individuals who " *sought to enter* into contractual relationships" from doing so, *id.,* at 172, 96 S.Ct. 2586 (emphasis added).    Section 1981 thus offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.   In this case, Defendants' actions impaired the existing TAA contract which necessarily derived from the CBG and further blocked the creation of new contractual relationships in the shipping arena on the part of both Nanko Shipping Guinée and Nanko Shipping USA.    In the latter regard, the parties approached the immediate claims as Co-Plaintiffs due to the practical and operational nature of the entities.   While separate legal entities, both Nanko entities acted in an alter ego and joint fashion pertinent to the immediate dealings as evidenced by Diané's centralized communications with Defendants,  Plaintiffs' common Washington, D.C. operation, and Nanko Shipping USA's intention to play a collaborative role in the execution of the subject CBG and TAA contracts beyond its shareholder status.   Thus, the amended complaint consistently refers to the Nanko Shipping companies in a joint capacity as "Plaintiffs."   In sum, Plaintiffs have sufficiently pled their third party beneficiary status and Defendants' breach of their rights as beneficiaries of the CBG.   Accordingly, Defendants' motion to dismiss this claim should be denied.

**C.** Plaintiffs' assert actionable §1981 race discrimination claims.[2]

According to § 1981:

"All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It is established that such contracts include employment contracts. *Johnson v. Ry. Express Agency, Inc.,* 421 U.S. 454, 460, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (holding that "§ 1981 affords a federal remedy against discrimination in private employment on the basis of race"); *see Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 224 (2d Cir. 2004) (noting that § 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment").

42 U.S.C. § 1981 protects the rights of individuals to make and enforce contracts free of racial discrimination. The statute defines making and enforcing contracts as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "A viable 'claim brought under §1981 therefore, must initially identify an impaired contractual relationship under which the plaintiff has rights,' and whether 'racial discrimination ... impairs an existing contractual relationship.'" *Morris v. Carter Global Lee, Inc.,* ——F.Supp.2d ——, ——, 2013 WL 5916816, at 5 (D.D.C.2013) (citing *Domino's Pizza, Inc. v. McDonald,* supra. At 476, (2006)). To establish a claim under § 1981, a plaintiff must show that: (1) he is a member of a racial minority group; (2) the defendant intended to discriminate on the basis of his race; and (3) the discrimination pertained to one of the activities enumerated in the statute. *Dickerson v. District of Columbia,* 806 F.Supp.2d 116, 119 (D.D.C.2011). Moreover, § 1981 "can be violated only by purposeful discrimination," *Gen. Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

---

[2] / This argument responds to Defendants' argument at Section G. of its Memorandum.

Defendants' argument at Section B. of its Memorandum misstates the pleading, relies on inapposite legal authority and minimizes Plaintiffs' Section 1981 race discrimination claims.  To be clear, this claims is advanced directly by Plaintiffs Nanko Shipping Guinée, Mori Diané (Chief Executive Officer), and Nanko Shipping USA per their dealings with Defendants including, but not limited to its Alcoa Shipping operation in Knoxville, Tennessee.  Consistent with the mandate of *Twombly* and *Iqbal,* Plaintiffs' amended complaint carefully and extensively details specific facts which constitute the predicate for its §1981 race discrimination claim at this, the pleading stage, of this case. While the pleadings allegations are not necessarily trial ready, when viewed with inferences favorable to Plaintiffs, they allege significant enough facts to more than minimally "nudge [their] claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. *See, e.g., Brown v. Children's National Medical Center,* 773 F.Supp.2d 125, 135 (D.D.C.2011) ("To state a claim under Section 1981 a plaintiff ... must allege 'some facts that demonstrate that race was the reason for the defendant's actions.' ") (quoting *Bray v. RHT, Inc.,* 748 F. Supp. 3, 5 (D.D.C.1990)); *Ndondji v. InterPark Inc.,* 768 F.Supp.2d 263, 274 (D.D.C.2011) (finding plaintiff's "occasional reference to his race in his amended complaint is also insufficient to make out a section 1981 action").

Plaintiffs' amended complaint presents both a unique historical backdrop where race has played a significant factor in Defendants' business dealings with the people and the government of Guinea, as well as a contemporaneous description of Defendants' interplay with Plaintiffs in the United States and the hostile, adverse and indifferent manner in which Defendants have refused to respect Plaintiffs' contract rights and thus

impaired its enjoyment of the contract and its benefits. Critical to this analysis is an understanding of the direct operational connection between effectuation of Plaintiffs' TAA with Guinea and Guinea's shipping rights pursuant to the CBG. As plead in Plaintiffs' Amended Complaint, Guinée unequivocally and unqualifiedly *controls* up to fifty percent (50%) of those shipping rights under the CBG, a fact which Defendants do and cannot not contest. See Amended Complaint at 13-14. Therefore, Defendants have no legal or contractual basis to allocate, navigate or otherwise control Guinée's rights and thus its agreement with Nanko Shipping to manage these shipping rights.

Plaintiffs further alleged that the CBG endorsed Guinea's contract with Nanko. *Id*. at para. 20-21. Resultantly as per the CBG and the TAA, Defendants were required to relinquish Guinea's percentage of the CBG's shipping rights to Nanko. They did not. Nevertheless, Defendants provided the same shipping rights to predominantly owned white shipping companies with less hostility, resistance and scrutiny despite Plaintiffs' offer of same or better shipping terms. *Id.* at 40-43. Paragraph 41 states that Defendants should have facilitated a transportation management transition from themselves (Alcoa Steamship) to Plaintiffs and thereby allowed Plaintiffs to direct the transportation (shipping) of fifty (50) percent of the mined bauxite in the same manner in which it allowed Klaveness, a white owned Norwegian Shipping company, to ship bauxite through 2011. Plaintiffs further allege that Defendants have refused, even until now, to provide Nanko any shipping opportunities whatsoever and have sought to impose consistent barriers to doing so. The Amended Complaint at paragraph 42 asserts that Defendants' imposition of a double standard with reference to the fact that Defendants denied Nanko any shipping opportunities while it awarded shipping contracts and

opportunities to Klaveness, a white owned company, and other shipping companies including Alcoa Steamship, despite Nanko's rights under the TAA.    Plaintiffs further alleged that Defendants consistently reduced Nanko to the status of a mere competitive bidder subjected to its subjective scrutiny and "satisfaction.    Plaintiffs' pleading, at paragraphs 26-31, specifically details Defendants' Knoxville Shipping Operation's adamant refusal to provide any shipping opportunities to Plaintiffs even though the shipping rights at issue did not belong to them.   These aforementioned allegations, viewed   in conjunction with paragraphs 59-63 and inferences in Plaintiffs' favor, delineate Alcoa's frequent interaction and direct dealings with Nanko USA's Washington, D.C. Office and Mr. Diané  regarding Nanko Guinea's enjoyment of its contract with Guinea.   Plaintiff asserts: "Despite the government of Guinea's urgings and CBG's Board resolution, Defendants have not taken any transitory, pilot, or other measures whatsoever to effectuate Nanko's contract."   See Amended Complaint at para. 68.   Plaintiffs finally allege that Defendants impaired their contract with Guinea as follows: "Defendants' actions have intentionally impaired Plaintiffs' third party beneficiary rights to contract with Guinea, and denied Nanko's right to enjoy the benefits of its Technical Assistance contract without racially motivated interference." *Id.* at 68.

Defendants' Memorandum at page 16 argues erroneously that Plaintiffs failed to allege that Defendants "*intended*" to discriminate against Plaintiffs on the basis of race. Attention is directed to Plaintiffs' Amended Complaint at paragraphs 48 and 56. Paragraph 48, which is incorporated by reference via 56 in the 1981 claim, states as follows:  "At all times referenced herein, Defendants have acted with impunity, malice and ill will to its significant financial benefit."   Additionally, in the same count,  Plaintiff

paragraph 67 states: "….Rather, Defendants have defiantly, *intentionally*, and maliciously ignored and denied Plaintiffs any shipping rights whatsoever,(sic)" Defendants' argument on this issue is clearly thinly iced and cannot withstand the record pleadings in this case. (Emphasis added).  Additionally, its Memorandum at 15 relies upon *Clifton Terrace Associates, Ltd. v. Limited Technologies Corp*. 728 F. Supp. 24, 31 (D.D.C.) as supporting authority for the purposeful discrimination requirement.  That case, however, is not on point.  Close review of the authority reveals that the ruling is based on a summary judgment and a well developed record, unlike here.  Also, Plaintiff in that case failed to allege discrimination: "Plaintiff has neither alleged nor argued that defendant was motivated by an intent to discriminate against Clifton Terrace residents. Proof of purposeful discrimination is required to recover under these statutes." *Id.* at 33.

Plaintiffs pled here that Defendants treated them differently and less favorably than white shipping companies.  Plaintiffs assert in great detail, via more than twenty (20) factual allegations, their racial background and membership in a protective class, their developed opportunity, an appropriate Board resolution, a unique capacity and relationship with global shipping companies, competitive pricing, various hostile and adverse communications with Defendants,  and conflicting statements regarding available contracts. These various circumstances  culminated in Defendants' adamant impairment of Plaintiffs' TAA and blockage of Plaintiffs obtaining new contracts and contract opportunities.

At this stage, Plaintiffs submit that it is enough that they have set forth allegations, with appropriate specificity and substantiation, that satisfy the prima facie case for race discrimination and that they unqualifiedly enjoyed the contract rights at

hand.   See *Spaeth v. Georgetown University*, 839 F.Supp. 2d 57, 281.  (D.D.C. Mar 13, 2012)  Moreover,   Plaintiffs submit that on "a motion to dismiss for failure to state a claim, the question [is] not whether Nanko plaintiffs will ultimately prevail on this  claim, but whether their Amended Complaint, as detailed herein,  sufficiently crosses the federal court's threshold." *Skinner v. Switzer,* 562 U.S. __, 131 S.Ct. 1289, 1296, 179 L.Ed.2d 233 (2011) (internal  quotation  marks  and  citations  omitted)  (citing *Swierkiewicz*, 534 U.S. at 514, 122 S.Ct. 992).   We urge upon this court that it does.

### D.  The Nanko Plaintiffs and Diané' are real parties in interest.

Citing Federal Rule of Civil Procedure 17(a),  Defendants assert that  neither Plaintiffs Nanko USA nor Diané are real parties in interest and lack standing particularly on the grounds that a parent corporation shareholder is not *ordinarily* entitled to enforce the substantive rights of its subsidiaries.   Plaintiffs, however, bring this action in other than their shareholder capacities.  While neither parties to the CBG or the TAA, Plaintiffs Nanko Shipping USA and Diané expected to play a role jointly with Nanko Guinée in the execution of the TAA  in the execution of  specific tasks outlined at paragraph 20 of the Amended Complaint, which states as follows:

> The Agreement was intended to create a base of national capacity of maritime transport by entrusting to Nanko Shipping the technical assistance to the Guinean state in order to transport mainly fifty percent (50%) of the production of bauxite of CBG and other products and ore available to Guinea. It further stated that Nanko Shipping or its subsidiary could have a head office in or outside Guinea. The Agreement, at Article 6, further anticipated that Nanko Shipping, acting on Guinea's behalf, would ensure the competitiveness of the CBG mining products and "strictly enforce the freight rate based on the data gathered from the international market." Its Article 7 required Nanko to provide financial, technical and statistical reports regarding its operation to the Government and thus to the CBG. Article 8 required Nanko to ensure employment preferences to Guinean sailors, training of Guinean personnel both at land and at sea, with a focus on senior positions with companies engaged in bulk carriage, and to establish a management training program to advance the skills of Guinean personnel. Article

11 stated that the government of Guinea will ensure that Nanko Shipping and its subsidiaries perform its functions in compliance with regulations in place.

Pursuant to this mandate, the government of Guinea expected the Nanko family of corporations to engage in the execution of the TAA's objectives.   Guinea thus realized that due to its infrastructure and limited capacity, a shipping company would necessarily depend, as did Klaveness, on the management and operational skills of its separate and distinct Norwegian parent corporation.   Guinea also understood that with Diané's background, experience and connections in the industry, that his presence in the United States independently and through Nanko Shipping USA could greatly assist in its ensuring the competitiveness of CBG products that would allow Nanko Shipping Guinée to collect timely and necessary information to enable it to offer competitive prices as required by Article 9 and thus strictly enforce the freight rate based upon that data. Thus, Plaintiffs approached the TAA not singularly, but jointly.   Moreover, Defendants communicated with Diané knowing that he and Nanko USA were involved in collaboratively with Nanko Guinée in the advocacy efforts related to the TAA, as well as its execution.   See Amended Complaint at paragraphs 25, 28, 32, 33, and 34, as well as Plaintiffs  Exhibits thereto.    Further, Diané and Nanko Shipping USA were keenly necessary in order to ensure that the transaction and the CBG companies were in compliance with United States laws, including the Foreign Corrupt Practices Act, particularly given then pending United States Justice Department investigations of Alcoa and the subsequent imposition of violations related thereto.

This argument equally applies to Defendants'Section 1981 argument. Instructively,  that law is much more expansive than Defendant acknowledges and offers specific relief when race discrimination, as alleged here, blocks the specific creation of a contractual relationship, as well as when  it impairs an existing contractual relationship. *Id.* at 476, 126 S.Ct. 1246.  Applying this rule, the Court held that the plaintiff in the Domino Pizza case failed to state a claim because he, unlike Plaintiffs here, personally, did not have any rights under the proposed contract; rather, it was the corporation, of which the plaintiff was president, that had the contractual rights that were at issue. Moreover, the nature of the contract rights that were at issue were different from the varied developmental based contract rights alleged here.

The factual scenario in this case is unique especially given the historical context in which Plaintiffs' contract rights, and prospective and potential contract opportunities developed.  Pursuant to the TAA, Guinea worn from the scars of a fifty (50) year history engaged the Nanko Shipping Corporate family to bring the CBG into a level of compliance with the prioritization of Guinean rights and all of the corresponding economic opportunity that the 1963 CBG mining contract intended.    With all attending inferences in plaintiff's favor, Plaintiffs relationship is distinct from the business agent relationship and mere executive duty function in Domino Pizza case.  Plaintiffs here are collaborative and engaging in the pursuit of national and international development goals on behalf of a poor, yet developing nation, and at all times referenced herein demonstrably acted in other than shareholder capacities.  Rather, Plaintiffs as indicated by the pleadings and their actions, acted as responsible U.S. based stakeholders, engaged

in co-management activities and functions that contributed to the success of Nanko Shipping Guinée's management of an estimated $100,000,000.00 million dollar book of transportation, shipping and trade related business.   This record, the pleadings and the above referenced Section 1981 analysis supports their distinct status and viability of their claims at this stage of the litigation.   Accordingly, this court should determine for purpose of the immediate pleadings that all Plaintiffs are real parties in interest for purpose of their pending claims.

### E.  Plaintiffs have joined all necessary parties to this suit.

Defendants argue that Plaintiffs have failed to join indispensable parties pursuant to Federal Rules of Civil Procedure  19(b) and 12(b)(7).   An indispensable party is a party in a lawsuit whose participation is required for jurisdiction for  the purpose of rendering a judgment in order to   avoid potential double litigation and possibly inequitable outcomes.   In determining whether a party is indispensable, courts generally look to three (3) factors: (1) Will the missing party's interests be harmed in some direct way by the outcome of the case? (2) Does the missing party have an interest which would cause another party to the case to be subjected to multiple obligations? and (3) Can the court provide complete relief to the plaintiff without the presence of the missing party? After a careful review of the facts of this case, it is apparent that all necessary parties have been joined.

Defendants claim that Guinea and Halco as parties to the CBG Convention have significant interest in this action and are therefore indispensable; however, Defendants' argument is significantly flawed.   Primarily, Defendants fail to inform the Court of the relationship between Halco and Alcoa.   Halco is the parent corporation of Alcoa.

Moreover, since the execution of the CBG Convention, Alcoa has assumed all rights and responsibilities under the CBG Convention.   Specifically, Alcoa has continuously shipped bauxite out of Guinea under the rights obtained by Halco through the CBG Convention.  It is abundantly clear that Halco and Alcoa share the same interest.  As a result, there is no potential harm to Halco from the outcome of this case and there is no risk for multiple obligations.  Alcoa's zealous representation of itself, is also a zealous representation of Halco.  Therefore, this Court can provide relief to Plaintiffs without adding Halco to this suit.  Alcoa has long since assumed the interest of Halco under the CBG Convention and cannot now attempt to disclaim interest in this suit in an attempt to circumvent Plaintiffs' claims.  However, if this Court concludes that Halco is a necessary party, this case should not be dismissed because Halco can be joined.  If joinder is required, joining Halco would not deprive this Court of either venue or subject matter jurisdiction.

Secondly, Defendants claim that Guinea is an indispensable party and further allege that because Guinea is a foreign sovereign this Court lacks jurisdiction under the Foreign Sovereign Immunities Act, unless a specified exception applies.  This argument is a red herring and meritless.  Contrary to Defendants' contention, there is no basis for Guinea involvement given the Technical Assistance Agreement.  Interestingly, Alcoa now suggests that Article 9 states that Guinea's rights are qualified. Ironically, Defendants' argument would nullify Plaintiffs rights to protect themselves from Defendants' alleged discrimination, which occurred substantially in the United States and reflects a genre of thinking and treatment which caused Guinea  to seek Plaintiffs' assistance.  Close scrutiny of Article 9 reveals that the  primary i "express condition"

related to Guinea's exercise of its shipping rights is competitive pricing, to wit that freight tariffs are lower or equal to those which are quoted at that particular time on the international shipping market for the identical shipping routes.   Defendants cannot possibly claim otherwise that Guinea does not enjoy the purported fifty percent (50%) of CBG's shipping.   If so, such a dispute is rooted in a factual rather than legal challenge and should not at this stage justify a dismissal of Plaintiffs' legal action.

Defendants also argue that the Courts interpretation of Article 9 could alter Guinea interest under the CBG. To what end, and if so, given the TAA, what necessitates Guinea's participation.  While Defendants may be correct in its view that this Court lacks jurisdiction over Guinea, Defendants miss two critical facts; as plead, the CBG and the TAA are valid legal contracts   Hence, with all attending inferences being made in Plaintiffs' favor, Guinea is not a necessary party.  Nor has Defendant explained, as a matter of law, why this court should rule as such.  Accordingly, Defendants' joinder argument lacks merit as a basis upon which to dismiss Plaintiff's claims.

### IV. CONCLUSION

Given the factual intensity of the immediate record and for reasons stated herein, Plaintiffs urge this Court to deny Defendants' Motion to Dismiss.  However, should the record herein suggests certain technical deficiencies, to allow Plaintiffs an opportunity to amend their complaint accordingly, consistent with Federal Rule of Civil Procedure 15.

Respectfully submitted,

_____/s/_____
Donald M. Temple, Esq.
1101 15th Street, NW,  Suite 203
Washington, DC 20005
dtemplelaw@gmail.com
202-628-1101
*Counsel for Plaintiffs*